JaGOTHARD, Judge.
Plaintiff, National Glass <& Glazing, Inc. (National), filed this action seeking payment of an outstanding balance of $43,857.48 due on a subcontract agreement to perform certain work at the New Orleans International Airport. Named as defendant in the suit is the general contractor, Grimaldi Construction, Inc. (Grimaldi), and Grimaldi’s surety, Fidelity and Deposit Company of Maryland (Fidelity). Grimaldi filed an exception of lis pendens asserting that this action is between the same parties, in the same capacities and on the same transaction or occurrence as an action entitled, “HGP Industries, Inc. v. Gri-maldi Construction, Inc., et al” filed previously in Civil District Court for the Parish of Orleans. In the memorandum in support of that exception, Grimaldi asserts that the parties to this litigation worked together on a project at the New Orleans Museum of Art (NOMA) during which Grimaldi agreed to accept certain glass from a glass manufacturer, I3HGP Industries, Inc. (HGP) on behalf of National to expedite the construction. When National refused to pay the $35,153.55 due for the glass, the manufacturer sued Grimal-di in Orleans Parish. Grimaldi asserted a third party claim against National in that action.
In the interim, a preliminary default was taken against Fidelity. Fidelity filed a motion for leave to amend the exception of lis pendens to add Fidelity as a mover and a motion to set aside the preliminary default. The trial court rendered judgment setting aside the preliminary default judgment against Fidelity, but denying the exception of lis pendens.
Subsequently, Grimaldi and Fidelity answered the petition denying National’s claim for payment and asserting the affirmative defense of set-off. Further, Grimaldi asserted a claim in reconvention against National in the amount of $250,000.00 based on an alleged failure to provide the glass required *59 by the terms and specifications of the contract on the NOMA project. National filed an exception of lis pendens to the reconven-tional demand arising from the NOMA project, which was granted by the trial court. Consequently, the reconventional demand asserted by Grimaldi was dismissed. That dismissal was not appealed.
The matter proceeded to trial, after which the trial court rendered judgment in favor of plaintiff, National, in the amount of $43,-857.48 with legal interest from date of judicial demand. The question of National’s claim for attorney’s fees was left open for supplemental memoranda. Subsequently, the trial court rendered judgment denying National’s claim for attorney’s fees. Two separate written judgments were rendered on the same day. Grimaldi and Fidelity appeal the judgment awarding National payment on the subcontract. National answered the appeal, questioning the trial court’s judgment denying attorney’s fees and penalties.
jAt trial the parties stipulated that the balance due to National on the airport project is $43,857.48; that Grimaldi was paid in full for the airport project on February 9, 1994; and that, on the off-set claim, Grimaldi has paid HGP Industries, Inc., $41,933.35 for glass on the museum project. There was also a stipulation that the original invoice for the glass on the NOMA project was in the amount of $35,153.55. The parties also agreed to admit a demand letter written by National on May 2, 1994, and a copy of the certified return receipt, as well as, a letter written by Eugene Grimaldi on May 4, 1994 to National.
There is no dispute between the parties concerning the quality of work or money due on the airport project. The only issue is whether Grimaldi is entitled to a set-off of the amount due on the airport project as a result of any debt due on the museum project.
The court heard testimony from Mark Gibson, secretary of National, who testified that, while National had subcontracts to do glass work on both the New Orleans Museum of Art and the New Orleans International Airport projects, the two contracts were not related. He further explained that HGP is a glass manufacturer which provided glass for the museum project, but not for the airport project. Mr. Gibson testified that National did not pay HGP for the glass delivered to the museum project because there was a series of problems with the glass supplied. Mr. Gibson stated that Grimaldi installed the window frames in the museum project through its subcontractor, Coast to Coast. National had the contract to install the glass. The glass installed was not accepted by the museum because the sizes were incorrect and the glass lacked an industry stamp on the mull of the window which would indicate that the glass met certain industry standards.
|5The fact that the museum would not accept the glass was discussed at a meeting with museum officials and their attorneys, at which representatives of National and Gri-maldi were present. For those reasons, National refused to pay HGP for the glass.
It is Mr. Gibson’s testimony that, in spite of the fact that the glass was not accepted by the museum, Grimaldi entered into a settlement agreement with HGP pursuant to which Grimaldi paid $41,933.35. National was notified of the payment by Grimaldi to HGP after the fact.
Mr. Gibson testified that, to his knowledge, the museum has still not accepted the glass. In fact, National has been sued in Orleans Parish in connection with the claims arising ■out of the glass on the museum project.[1] That suit is still pending. Mr. Gibson testified that he. was advised during discussions with representatives of Grimaldi that a consent judgment was being negotiated between Grimaldi and HGP in the Orleans Parish suit. Mr. Gibson explained that, at issue in the museum project was the size of the glass and the warranty. It was Grimaldi’s responsibility to furnish the frames for the glass and Grimaldi advised National of the size of glass needed to fit into the frames. Howev *60 er, the museum board hired a consultant who advised them that the glass needed more clearance than the frames installed by Gri-maldi provided. HGP refused to provide a warranty on the glass because it was installed without the correct clearance. After further investigation, it was discovered that the consultant made the recommendation based on aluminum frames, rather than .the steel frames installed in the museum. This fact led to settlement talks between HGP and Grimaldi in the Orleans Parish suit.
|e,On cross-examination Mr. Gibson acknowledged that National first installed annealed glass in the museum with the approval of the architect. However, National was advised later by the museum board that the specifications required heat tempered glass. After a meeting with representatives from Grimaldi in which the specifications were reviewed, National re-ordered heat tempered glass from HGP. Because HGP would not ship the glass without a guarantee of payment, Grimaldi agreed to be totally responsible for the amount due for the glass. To effect that agreement, National signed a joint cheek agreement and forwarded it to Grimal-di. Mr. Gibson explained that a joint check agreement, by which the general contractor writes a check jointly to the subcontractor and the supplier, is often required by suppliers on a construction job. The check would then be drawn on the proceeds owed by the general contractor to the subcontractor. Mr. Gibson was not sure when Grimaldi actually paid the invoice for the glass. Payment was demanded upon delivery, but Grimaldi did not pay at that time.
Mr. Gibson testified that there was some discussion at the time of a set-off of the amounts owed by National for the glass on the museum project against money due National on the airport project. Mr. Gibson stated that he had no problem with that arrangement because he assumed the glass shipment would be correct and he would owe the money anyway. He further stated that such arrangements were not uncommon in the construction industry.
The glass was shipped to the museum site. It was received and stored by Grimaldi. Mr. Gibson stated that when National was informed of the delivery of the glass, two representatives were sent out to the site to inspect the glass to verify the quantity and quality of the glass. However, the glass was in large crates stored in Grimaldi trailers, making the inspection too complicated to undertake. ^Subsequently, National learned the glass was incorrectly sized and did not have the industry mark, so it rejected HGP’s claim for payment. Because Grimaldi had accepted responsibility for the debt by virtue of a letter written to HGP guarantying the payment before the glass was shipped, HGP sued Grimaldi on the debt.
Mr. Gibson admitted he has never paid for the glass. He maintained Grimaldi should not have paid for the glass because National repeatedly informed Grimaldi the glass shipped was not what was ordered.
Mr. August Grimaldi, vice-president in charge of field operations for Grimaldi testified that it was the intent of Grimaldi to honor the joint check agreement with National to secure the glass needed for the museum project. Mr. Grimaldi explained that the glass originally installed in the museum was incorrect. There were several discussions among the principals about how to solve the problem, of which Mr. Grimaldi was aware, but in which he did not actively participate. He was informed that HGP would no longer extend credit to National, making it difficult to re-order the glass. Mr. Grimal-di received a letter from HGP agreeing to ship the order upon receipt of Mr. Grimaldi’s signature on the letter which requested certified funds upon delivery of the glass to the job site. Mr. Grimaldi stated that he spoke to Mr. Gibson who denied having credit problems with HGP. However, since the project was near completion, and it was agreed the glass installed had to be replaced, Mr. Gri-maldi and Mr. Gibson agreed to “work this thing out”. Mr. Grimaldi agreed to sign the guarantee to get the glass in, believing that the matter could be resolved by National with money earned on the airport job.
Mr. Grimaldi stated that when the glass arrived, Mr. Gibson had no place to store it, so Mr. Grimaldi agreed to store the glass in two forty-foot trailers owned by Grimaldi. Mr. Grimaldi stated he asked Mr. Gibson to *61 cheek the order and ^provided manpower and a forklift to accomplish the task. Mr. Grimaldi wanted to be sure the glass order was correctly filled and undamaged before he paid the invoice. Mr. Grimaldi admitted he did not comply with the agreement he signed with HGP to pay by certified funds upon ■delivery of the glass.
The glass was delivered in November, 1993. Problems developed with the museum board concerning the window wall, and a demand was made to Grimaldi to rebuild the window wall frame system which became the focus of the Orleans Parish law suit. Another issue in that action is whether the clearances between the edge of the glass and the edge of the frame meet the requirements for the warranty provided by HGP for the glass.
Because Grimaldi did not pay for the glass, HGP filed suit in Orleans Parish. After many discussions, Grimaldi reached a settlement with HGP in which HGP agreed to provide a warranty on the glass and Grimaldi paid the balance due on the invoice. Grimal-di paid $41,933.35 to HGP on May 18, 1994, in compliance with that settlement agreement. Mr. Grimaldi also testified that no one from National was consulted before the payment for the glass was made; and there was no inspection made to determine whether the glass delivered was in conformance with the order. Mr. Grimaldi contends National had the responsibility to check the order and did not advise him of any problems. Mr. Grimaldi acknowledged that there is still a balance due to National from Gri-maldi on the museum project which has not been paid because of the ongoing dispute over the glass wall.
Eugene Grimaldi, Jr., president of Grimal-di, testified that he had not been involved in the discussions with the museum board concerning the glass wall. He stated that, while he was aware of the discussions and controversy over the glass wall on the NOMA project, it was his brother, August, who attended those | üineetings. Eugene’s direct involvement in the matter was confined to the negotiations with HGP, and he participated in the discussions which led to the settlement. Mr. Eugene Grimaldi stated that he was motivated to settle with HGP because he, “knew that we were going to need their assistance and help in the future on the other NOMA project, so we didn’t want to make an adversary out of them”. Mr. Eugene Gri-maldi’s testimony differed from his brother’s in that Eugene recalled the issue of the warranty of the glass came about after the payment and was not a part of the settlement agreement. Eugene acknowledged that he did not verify that the glass delivered was as ordered before he paid HGP pursuant to the settlement agreement; and he did not notify National of the settlement and the subsequent payment.
Eugene stated he failed to sign the joint check agreement sent to him by National. Further, he admits he was in agreement with the action taken by his brother, August, in signing a letter to HGP agreeing to issue a certified check for the glass on delivery. Eugene explained that he felt Grimaldi had no other choice. When the glass was delivered, the decision was made not to issue the certified check as agreed. Subsequently, in settlement of the claim asserted against Grimal-di by HGP in the Orleans Parish lawsuit, the payment was made without any consultation with representatives of National. Mr. Gri-maldi maintained that his only obligation to National was to inform them the glass was delivered on November 3,1993. He said Mr. Gibson was put on notice that National owed HGP for the glass at that time because he knew Grimaldi had signed the letter agreeing to pay by certified funds on delivery. Mr. Grimaldi stated that it is the position of his company that the glass is in accordance with the specifications of the contract in all respects, and it can be installed immediately. Although, Eugene acknowledged that lipthe glass is still crated in Grimaldi containers, and nobody knows for sure whether the glass shipped has the required industry stamp.
The documentary evidence introduced at trial includes a demand letter from National to Grimaldi dated May 2, 1994 for payment of the balance due on the airport project, which is the subject of the instant suit. A letter dated May 4, 1994 from Eugene Gri-maldi to counsel for National in response to the demand letter, asserts that National had a greater indebtedness to Grimaldi than the *62 amount demanded because of offsets agreed to by National.
There is a letter to Mr. Grimaldi from National dated May 18, 1994, which confirms a meeting between the parties on May 17, 1994. According to that correspondence, the parties agreed upon certain amounts due for various joint projects. However, in regard to the NOMA project, the letter contains the following statement, “The reason the money has not been paid is because of the problem with the glass and window wall system at the New Orleans Museum of Art.” Also contained in the record is a letter dated June 22, 1994 from Mark Gibson to Eugene Grimaldi, denying any discussion or agreement connecting payment on the airport project to an offset of money owed to HGP on the NOMA project. Further, Mr. Gibson states in the letter,
The amount in question is clearly in dispute. HGP Industries, to our knowledge, has not been paid and should not be paid until they supply the glass in accordance with the plans and specifications. Until such time, HGP Industries is not entitled to any payment for the glass on the NOMA project.
Subsequently on June 27, 1994, Eugene Gri-maldi wrote a letter to Mark Gibson in which he states,
To make the record straight, Grimaldi Construction, Inc. paid to HGP Industries and Charles F. Seemann, their attorney $41,938.35 (our check number 22916 dated 5/18/94).
[[Image here]]
This was agreed to by both National Glass and Glazing and Grimaldi Construction, Inc. as the best thing to do to bring a resolution to the NOMA project and avoid a judgment by HGP.
The letter contains a request for a signature by Mark Gibson, presumably to bind National to the agreement to the offset. A request with which Mr. Gibson did not comply.
When questioned about the above correspondence, Eugene Grimaldi verified that he sent the correspondence and that he paid HGP on May 18, 1994 without informing Mr. Gibson. Mr. Grimaldi also admitted his company had no written surety agreement with National.
Mr. John Trstensky, the project estimator and coordinator on the NOMA project for National, testified that the first order for glass was incorrect. He intended to re-order the glass from HGP in accordance with the specifications. Because HGP would not ship the glass on credit, Mr. Trstensky met with August Grimaldi and Jim Berrigan, the representative of HGP. Mr. Grimaldi told Mr. Berrigan, Grimaldi would “guarantee” the payment for the glass. ■ It was agreed that a joint check agreement would be executed between the parties. In accordance with that agreement, on October 7, 1993, Mr. Trstensky prepared and executed a joint cheek agreement and mailed it to Grimaldi with a cover letter in which he states,
The joint check is for $32,031 and the balance owed to us on this job is $22,-495.48, therefore, we are requesting the balance be transferred from our retainage on the Airport Concourse C job. This would drop our balance from $55,800.63 which represents our retainage to $46,-265.11.
I realize you have requested the museum to hold $40,000.00 which is fine, but we do need to address the retainage balance that is still left on the airport job.
haOn appeal, Grimaldi argues six assignments of error. Five of those assignments address the merits of the trial court’s finding that no set-off was applicable to the debt owed National in the airport project based on the evidence presented.
LSA-C.C. art. 1893 provides in pertinent part that set-off or compensation, “takes place by operation of law when two persons owe to each other sums of money or quantities of fungible things identical in kind, and these sums or quantities are liquidated and presently due”. For compensation to be applicable, two distinct debts, equally liquidated and demandable, must exist contemporaneously. Hartley v. Hartley, 349 So.2d 1258 (La.1977); Hill Wholesale Distributing Co. v. Howat & Son, 27-936 (LaApp. 2 Cir. 1/24/96), 666 So.2d 1252.
*63 One debt has been established by stipulation, that of Grimaldi to National for $43,858.48 for the airport project. A stipulation has the effect of binding all parties and the court. R.J. D’Hemecourt Petroleum v. McNamara, 444 So.2d 600 (La.1983); cert. den. 469 U.S. 820, 105 S.Ct. 92, 83 L.Ed.2d 39 (1984).
The other debt has not been established in this trial. Grimaldi attempts to characterize the debt it paid in settlement of a lawsuit in a separate action between itself and HGP as a liquidated debt of National to Grimaldi. We do not agree with Grimaldi’s characterization. The letter of October 7,1993, in our view was a proposal to Grimaldi to enter into a joint check agreement after which an offset agreement would follow. Since the offer was rejected by Grimaldi, and Grimaldi chose instead to bind themselves to HGP by agreeing to tender certified funds upon delivery of the glass, the letter is not convincing proof of an offset agreement. Further, Mr. Trstensky’s characterization of August Grimaldi’s “guaranty” is simply his interpretation. It is clear from the testimony of the parties and the written | ^documents that National intended' to enter into a joint check agreement and Grimaldi rejected the offer, choosing instead to expedite the construction process by entering into an agreement with HGP to pay for the glass on delivery.
Because the basic requirement which is necessary to invoke C.C. art 1893, has not been established, that of two debts, we find no error in the trial court’s ruling that Gri-maldi is not entitled to a set-off or compensation which is applicable to the debt it acknowledges is owed to National for the airport project, the subject of the instant suit.
Grimaldi also argues, in the alternative, that the court should have reversed its prior ruling on the lis pendens exceptions. The grant of the exception of lis pendens filed by National dismissing Grimaldi’s recon-ventional demand for damages as a result of glass used in the NOMA project is a final appealable judgment which was not timely appealed and is therefore final. We have no jurisdiction to review that ruling.
Reconsideration of the denial of Grimaldi’s lis pendens motion was not an issue presented to the trial court. Nonetheless, we consider Grimaldi’s request for review of the denial of the lis pendens exception in this appeal since that ruling was an interlocutory judgment. Grimaldi argues that whichever claim is resolved first will subject the remaining claim to dismissal pursuant to the rules of res judicata. We do not agree.
As previously stated, Grimaldi filed an exception of lis pendens to this action based on the filing of the Orleans Parish lawsuit by HGP against Grimaldi for payment on the glass in which Grimaldi filed a third party claim against National.
LSA-C.C.P. art. 531 provides in pertinent part that, “(W)hen two or more suits are pending in a Louisiana court or courts on the same transaction or [ uoccurrenee, between the same parties in the same capacities, the defendant may have all but the first suit dismissed by excepting thereto.” We find the exception of lis pendens was correctly denied. The instant suit is an action for payment for work done on the New Orleans International Airport brought by National. The Orleans Parish suit is an action brought by HGP against Grimaldi for payment of supplies delivered to the New Orleans Museum of Art project in which National was made a third party defendant. Further, the third party demand asserted by Grimaldi against National in the Orleans Parish suit alleges that National breached its contract with Grimaldi in failing to provide glass as required by the terms and specifications of the agreement between the parties in the NOMA project. Grimaldi seeks $250,000.00 in damages from National in that suit. The two actions are neither between the same parties in the same capacities nor do they arise out of the same transaction or occurrence. Thus, the trial court correctly denied the exception of lis pendens.
National answered the appeal, arguing the trial court erred in failing to award attorney’s fees and penalties and in awarding interest from date of judicial demand rather that from the date payment was due. National’s claim for attorney’s fees and penal *64 ties is based on LSA-R.S. 38:2241 and R.S. 9:2784(C). R.S. 9:2784(C) provides for penalties and attorney’s fees in cases in which a contractor fails to make payment to a subcontractor within fourteen consecutive days of receipt of payment from the owner. Recently, the Fourth Circuit has held that the Public Works Act provides the exclusive remedies available to parties in public construction. Dixie Bldg. Material v. Liberty Somerset, 94-1373 (La.App. 4th Cir. 3/29/95), 656 So.2d 1041; writ denied 95-1828 (La. 10/27/95), 661 So.2d 1346. We find that holding to be sound and adopt the rule of law.
| igThe trial court made clear in the reasons for judgment, that the claim for attorney fees was denied because National did not meet its burden of proof that it was in strict conformance with the Public Works Act as set out in LSA-R.S. 38:2241 et seq. R.S. 38:2246 provides in part:
After amicable demand for payment has been made on the principal and surety and thirty days has elapsed without payment being made, any claimant recovering the full amount of his recorded or sworn claim whether by concursus proceeding or separate suit, shall be allowed ten percent attorney’s fees which shall be taxed in the judgment on the amount recovered.
That statute is penal in nature and its provisions must be strictly construed. Chabanais Concrete Pumping, Inc. v. Woodrow Wilson Construction Co., Inc., 94-0084 (La.App. 4 Cir. 6/30/94), 640 So.2d 862. The burden is on National to show that amicable demand was made of the principal and surety. Chabanais Concrete Pumping Inc. v. Woodrow Wilson Construction Co., Inc., supra.
The trial court based its refusal to award attorney’s fees on a lack of evidence to show that National made amicable demand of Fidelity & Deposit Company of Maryland, Gri-maldi’s surety. At trial National showed only that it mailed a demand letter to Gri-maldi on May 2, 1994. The only evidence offered to show that the surety was notified was a “ee” at the bottom of the letter, indicating that a carbon copy of the letter was mailed to Fidelity. The only proof of receipt of the letter is a “return receipt” card addressed to Grimaldi Construction. There is no evidence that the copy of the letter purported to be sent to Fidelity was received. Given those facts we find no error in the ruling by the trial court that National is not entitled to an award of attorney’s fees.
National also argues that the trial court should have awarded interest from the date the debt was due rather than from date of judicial demand. We agree. LSA-C.C. art. 2000 (formerly 1938) provides that, “when the object of the performance |i6is a sum of money, damages for delay in performance are measured by the interest on that sum from the time it is due, at the rate agreed by the parties or, in the absence of agreement, at the rate of legal interest as fixed by Article 2924”. In this matter all parties agreed and, in fact, stipulated to the fact that $43,857.48 was due to plaintiff, and that the defendant had been paid in full by the owner of for the project on February 9, 1994. The only issue was whether the defendant was entitled to a set-off on that amount. We find that under the circumstances of this case, interest is due from the date the money was due under the contract and the applicable law and not from the date of judicial demand.
For the above reasons we amend the trial court’s judgment assessing interest from the date of judicial demand to award interest from the date the debt became due, in all other aspects we affirm the judgments of the trial court.
AMENDED AND AS AMENDED, AFFIRMED.

. It is unclear from Mr. Gibson's testimony concerning legal actions in New Orleans arising out of the museum project whether he is speaking of the third party reconventional demand brought against National in the action brought by HGP against Grimaldi, or a separate action brought by NOMA.